# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **NATIONAL TREASURY EMPLOYEES UNION**, *et al.*, | ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | **Civil Action No. 05-201 (RMC)** |
| **MICHAEL CHERTOFF, Secretary, Department of Homeland Security**, *et al.*, | ) ) ) |  |
| Defendants. | ) ) |  |

## MEMORANDUM OPINION

The terrorist attacks on September 11, 2001, elevated to preeminence existing concerns regarding a federal system that diffused the responsibility for domestic security among numerous separate and independent agencies. Because "[t]he United States needs a homeland security establishment that can help prevent catastrophic attacks, mobilize national resources for an enduring conflict, and assist in recovery efforts all the while protecting this Nation's values and liberties," Congress created the Department of Homeland Security ("DHS") and gave its executive leadership the unenviable task of melding into a cohesive whole 22 agencies and parts of agencies that had previously been spread across the federal government. H.R. Rep. No. 107-609, at 63-64 (2002), *reprinted in* 2002 U.S.C.C.A.N. 1352, 1353; *see* Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296 (Nov. 25, 2002) (codified as amended at 6 U.S.C. § 101, *et seq.* (2005)). Congress gave the Secretary of DHS ("Secretary") and the Director of the Office of Personnel Management ("OPM") (collectively "Agencies") extraordinary authority to develop a separate human resources management system ("HR System") for DHS without regard to many of the

constraints imposed by the civil service laws that normally govern employees in the competitive service of the federal government.

Congress set out specific system requirements for the new HR System, mandating that it be flexible, contemporary, and ensure the ability of employees to bargain collectively. The National Treasury Employees Union, American Federation of Government Employees, National Federation of Federal Employees, National Association of Agriculture Employees, and Metal Trades Department of the AFL-CIO ("Unions"), which collectively represent approximately 60,000 DHS employees, challenge the regulations implementing DHS's new HR System for allegedly failing to comply with these requirements and for exceeding the authority of the Agencies. The Agencies move to dismiss and the Unions move for summary judgment.

As detailed below, the Court concludes that significant aspects of the HR System fail to conform to the express dictates of the Homeland Security Act. Implementation of Subpart E and 5 C.F.R. § 9701.706(k)(6) of Subpart G will be enjoined. Should the Agencies wish to submit an order that more selectively enjoins Subpart E in a manner otherwise comporting with this memorandum opinion, the Court would be willing to entertain it. A memorializing order accompanies this memorandum opinion.

I.      **BACKGROUND**

A.   This Litigation

DHS resulted from the largest reorganization of the federal government in decades. This behemoth and complex department was established by the HSA, an equally behemoth and

complex statute.[1]  The primary missions of DHS are to prevent terrorist attacks in the United States,

reduce our vulnerability to attack, and minimize damage from terrorist attacks, while simultaneously

carrying out all of the functions of the agencies and subdivisions within the Department that are not

related directly to securing the United States.  *See* HSA § 111(b)(1).  DHS employs approximately

110,000 people, many of whom are directly engaged in intelligence, counterintelligence, or

investigative work related to terrorism investigations.  Employees in such positions, among others,

are not represented by the Unions and are not covered by the regulations under challenge.  *See* HSA

§ 842(b), (e).

Given the enormity of the task of creating a cohesive whole out of all these disparate

parts, Congress specifically authorized the Agencies to establish a new HR System at DHS

"[n]otwithstanding any other provision" of Title 5, United States Code, which governs federal

employment, except as noted.  *See* 5 U.S.C. § 9701(a).  The extraordinary nature of this grant of

authority is described below.

The Agencies worked diligently to develop a new HR System that would meet the

System Requirements set by law.  There is no dispute here that, as part of that process, the Agencies

---

[1]

> The bill to create a Department of Homeland Security consolidate[d] 22
> Federal agencies comprising 170,000 employees, 17 different unions, 77
> existing collective bargaining units, 7 payroll systems, [and] 80 different
> personnel management systems . . . . Reorganizing an agency with all the
> vested interests and positions that involves is a . . . monumental job.  It is
> imperative that some sort of procedure is put in place to enable the
> Secretary to create one unified Department to prevent terrorist attacks
> and protect our homeland.

148 Cong. Rec. S11017 (Statement of Sen. Thompson) (Nov. 14, 2002).

fulfilled the "provisions to ensure collaboration with employee representatives"[2] and provided written descriptions of the proposed changes to each employee representative; gave them time to review and make recommendations; considered their comments; and engaged in pre-implementation congressional notification, consultation, and mediation.  At the end of this lengthy process, the Secretary determined "that further consultation and mediation [was] unlikely to produce agreement," and published final regulations on February 1, 2005.  Department of Homeland Security Human Resources Management System, 70 Fed. Reg. 5272 (February 1, 2005) ("Regulations").  The Plaintiff Unions sued immediately, pursuant to Section 112(e) of the HSA, which states that regulations issued by the Secretary shall be subject to challenge under the Administrative Procedure Act.  *See* 5 U.S.C. § 702.  While briefing progressed on the parties' motions to dismiss and for summary judgment, the Unions moved for a preliminary injunction to forestall the effective date of the new HR System, scheduled for August 1, 2005.  The Court held two hours of oral argument on the motions on July 14, 2005, and then asked for, and received, the Government's assurance that it would postpone the effective date until after August 15, 2005, so that the Court could rule on the merits in the first instance and not on the motion for a preliminary injunction.  With thanks for this courtesy, the Court has carefully considered the arguments of the parties, and the entire record, and issues its opinion on an expedited basis.

B.  Federal Labor Relations

The Federal Sector Labor Management Relations Act ("FSLMRA"), 5 U.S.C. §§ 7101-7106, 7111-7135 (2000), extends the right to bargain collectively through union representatives to most federal employees, with important caveats.  If a union is elected by majority

---

[2] 5 U.S.C. § 9701(e) (reformatted from upper case to lower case).

vote to represent an appropriate bargaining unit of employees, the employing agency must meet with union representatives to negotiate a collective bargaining agreement in good faith. *Id.* § 7114(a)(4). The parties bargain concerning "conditions of employment," *id.* § 7102(2), defined as those "personnel policies, practices, and matters . . . affecting working conditions," *id.* § 7103(a)(14). While management retains its rights to make decisions without bargaining concerning wages and other subjects commonly negotiated in private-sector bargaining, *see* 5 U.S.C. § 7106(a), a federal-sector union can demand that the agency negotiate concerning the "impact and implementation" of most management rights, *see Dep't of the Navy v. FLRA*, 962 F.2d 48, 50 (D.C. Cir. 1992); 5 U.S.C. § 7106(b)(2)-(3), unless the impact is *de minimis. See Nat'l Weather Serv. Employees' Org. v. U.S. Dep't of Commerce*, 37 F.L.R.A. 392, 396 (1990).

Subjects for bargaining in the federal sector are divided into three categories. "Mandatory" subjects are those over which management is required to bargain upon request. "Permissive" subjects are those over which management can lawfully bargain but a union cannot force bargaining; any contract reached covering permissive terms is fully enforceable. "Prohibited" subjects are those over which management of an agency is not allowed by law to bargain. "[T]he phrase 'conditions of employment' in turn is defined to include essentially all 'personnel policies, practices, and matters . . . except . . . to the extent such matters are specifically provided for by federal statute.'" *U.S. Dep't of Health and Human Servs. v. FLRA*, 858 F.2d 1278, 1283 (7th Cir. 1988) (citing 5 U.S.C. § 7103(a)(14)); *see also FLRA v. U.S. Dep't of Justice*, 994 F.2d 868, 872 (D.C. Cir. 1993) ("[B]y case law and statutory reference, the term 'impact and implementation' includes only the 'procedures which management officials of the agency will observe in exercising' management rights and 'appropriate arrangements for employees adversely affected by the exercise'"

of the management rights defined by 5 U.S.C. § 7106(a).) (citation omitted).  Even when bargaining

is prohibited because issues are covered by a statute, the parties still "negotiate anything that

complements, supplements, or explains the matter covered by federal statute."  Henry H. Robinson,

*Negotiability in the Federal Sector* 13-14 (1981).

Negotiations are prohibited on matters covered by a federal statute and specified

management rights, including, *inter alia*, the mission, budget, and organization of the agency, the

right to manage an agency's workforce and fill positions from certain pools of candidates, and the

right to take "whatever actions may be necessary to carry out the agency mission during

emergencies." 5 U.S.C. § 7106(a)(2)(A)-(D).  A federal-sector union can demand bargaining over

agency rules and regulations as long as the rule or regulation "is not a Government-wide rule or

regulation." *Id*. § 7117(a)(1).  However, if an agency can demonstrate a "compelling need" for the

rule or regulation, *id.* § 7117(a)(2), it need only bargain about its impact and implementation and not

about the decision to adopt the rule in the first place.  Whether an agency has demonstrated a

compelling need for a non-negotiated rule or regulation is determined by the Federal Labor Relations

Authority ("FLRA").  *Id.* § 7117(b).

When good faith negotiations fail to produce a collective bargaining agreement, the

parties submit their dispute to the Federal Service Impasses Panel ("FSIP") or another form of

binding arbitration approved by the FSIP.  *Id.*  The FSIP "is an entity within the [FLRA], the

function of which is to provide assistance in resolving negotiation impasses between agencies and

exclusive representatives."  *Id.* § 7119(c).  The FSIP is composed of a Chairman and six other

members, appointed by the President.  *Id*. § 7119(c)(2).  The FSIP will investigate the parties'

impasse and assist in its resolution, including making a determination of contract terms that the

parties must accept as binding.

C.  The DHS HR System

Because of the nature of the crisis that led to its establishment and because of the immensity of the task of coordinating the new Department, Congress gave the Agencies a five-year window in which they might establish a new HR System that is flexible, contemporary, and "ensure[s] that employees may organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them, subject to any exclusion from coverage or limitation on negotiability established by law."  5 U.S.C. § 9701(b) (system requirements);[3] 5 U.S.C. § 9701(h) (sunset provision).  In this effort, the Agencies were freed from the requirements of Title 5, Chapters 71 (collective bargaining), 75 (adverse actions) and 77 (appeals).[4]  Pursuant to these authorities and the Secretary's authority to issue regulations, *see* HSA § 102(e) (issuance of regulations), and after extensive consultations with the Plaintiff Unions and others, the Agencies issued Final Regulations on February 1, 2005.

1.  Collective Bargaining Provisions

The Regulations emphasize the Department's need to have "flexibility to carry out its vital mission."  *See* 70 Fed. Reg. at 5274; *see also id.* at 5278-79 ("The ability to act quickly is central to the Department's mission . . . .  This ability to act quickly is necessary . . . .  [The] HR

---

[3]  A fourth system requirement is that the new HR System "not waive, modify or otherwise affect" equal employment opportunity, affirmative action, prohibited personnel practices and the like.  5 U.S.C. § 9701(b)(3).  This provision is not at issue here.

[4]  *See* 5 U.S.C. § 9701(b) (system requirements); 5 U.S.C. § 9701(c) (other nonwaivable provisions of Title 5).  In an effort to make this description comprehensible, the Court drops many statutory citations to the footnotes.  The reader is advised that statutory sections that begin with a seven, *e.g.*, § 7701, pertain to traditional civil service while sections that begin with a nine, *e.g.,* § 9701, apply only to DHS.

system must provide the flexibility DHS needs . . . ."); *id.* at 5279 ("[N]egotiated procedures have

hindered day-to-day operations . . . . [T]he Department's managers and supervisors must be able to

make split-second decisions to deal with operational realities . . . ."); *id.* at 5305 ("[T]hese

regulations provide the Department with the flexibility necessary to accomplish its vital mission.

In so doing, they also provide that interpretations of these regulations by the Secretary and the

Director be accorded great deference."); *id.* ("This section of the regulations recognizes and stresses

the fundamental purpose underlying the Homeland Security Act and the statutory mandate to build

a flexible personnel system . . . .").

As a result, the Regulations contain an expansive management rights provision and

severely restrict collective bargaining to issues that affect individual employees.  Because of its

importance to this litigation, this part of the Regulations will be quoted in full:

9701.511 Management Rights

(a)      (1) To determine the mission, budget, organization, number of
employees, and internal security practices of the Department;
         (2) To hire, assign and direct employees in the Department; to assign
work, make determinations with respect to contracting out, and determine
the personnel by which Department operations may be conducted; to
determine the numbers, types, grades or occupational clusters and bands of
employees or positions assigned to any organizational subdivision, work
project or tour of duty, and the technology, methods and means of
performing work; to assign and deploy employees to meet any operational
demand; and to take whatever other actions may be necessary to carry out
the Departments's mission; and
         (3) To lay off and retain employees, or to suspend, remove, reduce
in grade, band or pay, or take other disciplinary action against such
employees or, with respect to filling positions, to make selections for
appointments from properly ranked and certified candidates for promotion
or from any other appropriate source.

(b)      Management is prohibited from bargaining over the exercise of any
authority under paragraph (a) of this section or the procedures that it will

observe in exercising the authorities set forth in paragraphs (a)(1) and (2) of this section.

(c)    Notwithstanding paragraph (b) of this section, management will confer with an exclusive representative over the procedures it will observe in exercising the authorities set forth in (a)(1) and (2) of this section . . .

(d)    If an obligation exists under § 9701.518 to bargain, confer, or consult regarding the exercise of any authority under paragraph (a) of this section, management must provide notice to the exclusive representative concurrently with the exercise of that authority and an opportunity to present its views and recommendations regarding the exercise of such authority under paragraph (a) of this section. [Management is allowed to give earlier notice.] . . . Further, nothing in paragraph (d) of this section establishes an independent right to bargain, confer or consult.

(e)    To the extent otherwise required by § 9701.518 and at the request of an exclusive representative, the parties will bargain . . . over –
    (1)  Appropriate arrangements for employees adversely affected by the exercise of any authority under paragraph (a)(3) of this section and procedures which management officials and supervisors will observe in exercising any authority under paragraph (a)(3) of this section; and
    (2)(i) Appropriate arrangements for employees adversely affected by the exercise of any authority under paragraph (a)(1) or (2) of this section, provided that the effects of such exercise have a significant and substantial impact on the bargaining unit, or on those employees in that part of the bargaining unit affected by the action or event, and are expected to exceed or have exceeded 60 days. Appropriate arrangements within the duty to bargain include proposals on matters such as –
        (A) Personal hardships and safety measures; and
        (B) Reimbursement for out-of-pocket expenses incurred by employees as the direct result of the exercise of authorities under this section . . . .
    (ii) Appropriate arrangements within the duty to bargain do not include proposals on such matters as –
        (A) The routine assignment to specific duties, shifts, or work on a regular or overtime basis; and
        (B) Compensation for expenses not actually incurred, or pay or credit for work not actually performed.

(f)    Nothing in this section will delay or prevent the Department from exercising its authority.  Any agreements reached with respect to paragraph (e)(2) of this section will not be precedential or binding on subsequent acts,

or retroactively applied, except at the Department's sole, exclusive, and unreviewable discretion.

5 C.F.R. § 9701.511.  Translated into English, this Regulation would give management full discretion over all aspects of the Department except those that might be seen as personal employee grievances: management would engage in collective bargaining concerning procedures by which it makes its decisions and "appropriate arrangements" for employees affected by its decisions to lay off, discharge, discipline, and promote.  Notice of any specific layoff, discharge, discipline, or promotion would not need to be given until such time as the Department actually took action, although the Regulations contemplate that the Unions may seek, and management might agree to give, prior notice.  Collective bargaining[5] over any other subject would be prohibited. Management would "confer" – but not bargain – with Union representatives concerning procedures for its exercise of all other management rights.[6]

---

[5]  Collective bargaining is defined to "mean[] the performance of the mutual obligation" of "a" management representative and "a" union representative "to meet at reasonable times and to consult and bargain in a good faith effort to reach agreement with respect to the conditions of employment affecting [represented] employees and to execute, if requested by either party, a written document incorporating any collective bargaining agreement reached," but neither party is obliged "to agree to a proposal or to make a concession."  5 C.F.R. § 9701.504.

[6]  *See* 5 C.F.R. § 9701.512 Conferring on procedures for the exercise of management rights.

> (a)   As provided by § 9701.511(c), management, at the level of recognition, will confer with an appropriate exclusive representative to consider its views and recommendations with regard to procedures that management will observe in exercising its rights under § 9701.511(a)(1) and (2).  This process is not subject to the requirements established by §§ 9701.517(a)(5) (regarding enforcement of the duty to consult or negotiate), 9701.518 (regarding the duty to bargain and consult), and 9701.519 (regarding impasse procedures).  Nothing in this section requires that the parties reach agreement on any covered matter.  The parties may, upon mutual agreement, provide for the Federal Mediation and Conciliation Service or another third party to assist in this process.  Neither the HSLRB nor the [FLRA]

Under the new HR System, a collectively bargained agreement at DHS would become effective and binding if not disapproved by the Secretary or his designee within 30 days after its submission for review, "but only if consistent with law, the regulations in this part, Governmentwide rules and regulations, Departmental implementing directives and other policies and regulations, and Executive orders." *Id.* § 9701.515(d)(3). "Provisions in existing collective bargaining agreements are unenforceable if an authorized agency official determines that they are contrary to law, the regulations in this part, Governmentwide rules and regulations, Departmental implementing directives (as provided by § 9701.506) and other policies and regulations, or Executive orders." *Id.* § 9701.515(d)(5). The Agencies acknowledge that these provisions would allow DHS to reject any term of a collective bargaining agreement negotiated under the new HR System if a subsequent implementing directive or other policy or regulation were deemed inconsistent.[7]

Collective bargaining under the new HR System would be of relatively short duration: 60 days to bring extant collective bargaining agreements into compliance with the new Regulations, 70 Fed. Reg. at 5306; 90 days for bargaining for a new collective bargaining agreement, *id.* at 5338;

---

may intervene in this process.
(b)   The parties will meet at reasonable times and places but for no longer than 30 days, including any voluntary third party assistance, unless the parties mutually agree to extend this period.
(c)   Nothing in the process established under this section will delay the exercise of a management right under § 9701.511(a)(1) and (2).
(d)   Management retains the sole, exclusive, and unreviewable discretion to determine the procedures that it will observe in exercising the authorities set forth in § 9701.511(a)(1) and (2) and to deviate from such procedures, as necessary.

[7] At oral argument, counsel for the Agencies argued that only a Department-wide directive, policy or regulation could override the terms of a negotiated collective bargaining agreement. This limitation is suggested in the Preamble to the Regulations but not definitively stated in the Regulations themselves. *See* 70 Fed. Reg. at 5310.

and 30 days for mid-term bargaining, *id.* at 5339.  The Regulations allow for assistance with bargaining from the Federal Mediation and Conciliation Service or another acceptable neutral.  *Id.* Should such negotiation sessions reach impasse, the impasse would be resolved (and terms set for a new contract) by a new entity established by the HR System, called the Homeland Security Labor Relations Board ("HSLRB").  5 C.F.R. § 9701.508(f)(11).

 2. Role of Federal Labor Relations Authority

 The role of the FLRA under the FSLMRA would be largely supplanted by the HSLRB in the HR System.  The HSLRB is to have three or more members, appointed by the Secretary from a list of nominees to which the Plaintiff Unions can make recommendations.  *Id.* § 9701.508(c)(1).  Whenever the Secretary believes that additional members of the HSLRB are needed, s/he could appoint two or more new members.  *Id.* § 9701.508(d).  The Secretary alone would decide if members of the HSLRB should be relieved from duty or not reappointed.  The HSLRB is to make all decisions on the scope of bargaining and the duty to bargain in good faith;[8] requests for information; exceptions to arbitration awards involving the exercise of management

---

 [8]  5 C.F.R. § 9701.517 defines certain unfair labor practices that are withdrawn from FLRA jurisdiction and assigned to the HSLRB, including whether either party has refused to consult or negotiate in good faith, or failed or refused to cooperate in impasse procedures and decisions as required by the new HR System and implementing Regulations.  "In addition, because these regulations provide that any provision of a collective bargaining agreement that is inconsistent with these regulations or the implementing directives is unenforceable on the effective date of coverage, [DHS] did not identify the action set forth in 5 U.S.C. § 7116(a)(7) as an unfair labor practice."  70 Fed. Reg. at 5309.  At 5 U.S.C. § 7116(a)(7), the FSLMRA makes it an unfair labor practice for management to enforce any rule or regulation which is inconsistent with an applicable collective bargaining agreement if the agreement were in effect before the rule or regulation was prescribed.  The Agencies stated that "for reasons of homeland security, it is imperative that these regulations and any implementing directives trump provisions of existing collective bargaining agreements if these provisions are inconsistent with the regulations or directives."  70 Fed. Reg. at 5310.

rights and the duty to bargain; and the resolution of all bargaining impasses. *Id.* § 9701.509. Individual members of the HSLRB would be allowed to investigate, hear, and decide any case brought before it[9] although in cases involving unfair labor practices and/or negotiability disputes, a party could seek review of a single member's decision by appealing to the full HSLRB; in all other respects, decisions of the HSLRB would be final and binding. 5 C.F.R. § 9701.508(g). The HSLRB could issue binding Department-wide opinions that might affect unions and employees not parties to a specific dispute before it. *See id.* § 9701.509(b). The HSLRB would also be authorized to assume jurisdiction over any matter that was submitted to FLRA if the matter affects homeland security, a decision to be made by the HSLRB that would be final and not subject to review by the FLRA. *Id.* § 9701.509(a)(7). This broad jurisdiction is premised on the "imperative that HSLRB retain jurisdiction over each matter for which an understanding and appreciation of the Department's mission is necessary." 70 Fed. Reg. at 5307.

In contrast, the powers and duties of the FLRA would be limited to certain of its normal activities: the determination of the appropriateness of bargaining units and conducting elections; ruling on exceptions to arbitration awards (unless the arbitrator addressed management rights or the duty to bargain); and adjudicating certain unfair labor practices.[10] FLRA would have

---

[9]  70 Fed. Reg. at 5307 ("In addition, we have permitted individual HSLRB members to adjudicate disputes . . . [to] provide the HSLRB with more flexibility to manage its workload, but [without] significant[] prejudice [to] the interests of either the Department or its employees.").

[10]  5 C.F.R. § 9701.517(a) identifies four management unfair labor practices that would be subject to FLRA jurisdiction: (1) "To interfere with, restrain, or coerce any employee in the exercise . . . of any right under this subpart; (2) To encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment: (3) To sponsor, control, or otherwise assist any labor organization, other than to furnish, upon request, customary and routine services and facilities on an impartial basis . . . ; [and] (4) To discipline or otherwise discriminate against an employee because the

no authority to review and rule on information requests, impasses, or unfair labor practice charges involving management rights or the duty to bargain.

The Regulations do state that FLRA shall "review HSLRB decisions and issue final decisions," subject to review in the federal courts of appeals under 5 U.S.C. § 7123, which is a provision of Title 5 that is not waived.  However, in its review, the FLRA

> must defer to findings of fact and interpretations of this part made by the HSLRB and sustain the HSLRB's decision unless the requesting party shows that the HSLRB's decision was –
>> (i) Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> (ii) Based on error in applying the HSLRB's procedures that resulted in substantial prejudice to a party affecting the outcome; or
>> (iii) Unsupported by substantial evidence.
>
> (2) The [FLRA] must complete its review of the record and issue a final decision within 30 days after receiving the party's timely response to such a request for review.  This 30-day time limit is mandatory, except that the [FLRA] may extend its time for review by a maximum of 15 additional days if it determines that . . .
>> (i) The case is unusually complex; or
>> (ii) An extension is necessary to prevent any prejudice to the parties that would otherwise result.

---

employee has filed a complaint or petition, or has given any information or testimony under this subpart."  5 U.S.C. § 7116(a) defines the analogous management unfair labor practices at non-DHS agencies in similar language.

5 C.F.R. § 9701.517(b) likewise identifies four union unfair labor practices that would be subject to FLRA jurisdiction: (1) "To interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this subpart; (2) To cause or attempt to cause the Department to discriminate against any employee . . . ; (3) To coerce, discipline, fine, or attempt to coerce a member . . . as punishment, reprisal, or for the purpose of hindering or impeding the member's work performance or productivity as an employee or the discharge of the member's duties as an employee; (4) To discriminate against an employee . . . on the basis of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition."  Similar language is used for other federal unions at 5 U.S.C. § 7116(b).

-14-

(3) No extension beyond that provided by paragraph (h)(2) of this section is permitted.

(4) If the [FLRA] does not issue a final decision within the mandatory time limit . . . , the [FLRA] will be considered to have denied the request for review of the HSLRB's decision, which will constitute a final decision of the [FLRA] and is subject to judicial review in accordance with 5 U.S.C. § 7123 [to the federal courts of appeals].

5 C.F.R. § 9701.508(h)(1)-(4).  The Regulations also establish certain procedural requirements for the appeal of an HSLRB decision to the FLRA.  *See id.* § 9701.508(h).  Either party must request review "of the record of a[n] HSLRB decision" within 15 days and the opposing party must file a response "[w]ithin 15 days after the [FLRA's] receipt of the request." *Id.* § 9701.508(h)(1).  A single request for an extension not to exceed 15 days would be allowed.

3.  Role of the MSPB

Chapter 77 of the Title 5 of the United States Code provides for appeals to the MSPB of adverse actions against federal employees.  The HSA relieves DHS from Chapter 77 for purposes of developing the new HR System.  5 U.S.C. § 9701(f).  However, "[a]ny regulations . . . which relate to any matters within the purview of chapter 77" addressing appeals to MSPB –

(A) shall be issued only after consultation with the Merit Systems Protection Board;

(B) shall ensure the availability of procedures which shall –
      (i) be consistent with the requirements of due process; and
      (ii) provide, to the maximum extent practicable, for the expeditious handling of any matters involving the Department; and

(C) shall modify procedures under chapter 77 only insofar as such modifications are designed to further the fair, efficient, and expeditious resolution of matters involving the employees of the Department.

5 U.S.C. § 9701(f)(2).  Count 3 of the Complaint challenges the Regulations insofar as they would

reduce MSPB's authority to mitigate (reduce) penalties.  The Agencies explain that it is their intent

that mitigation be permitted

> only in very limited circumstances.  We continue to believe that, because
> the Department bears full accountability for homeland security, it is in the
> best position to determine the most appropriate action for poor performance
> or misconduct.  Thus, its judgment in regard to penalty should be given
> deference. . . .  Accordingly, the final regulations preclude mitigation of the
> penalty selected by DHS except where, after granting deference to the
> Department, a determination is made that the penalty is so disproportionate
> to the basis for the action as to be wholly without justification.
>
> This authority is significantly more limited than MSPB's current mitigation
> authority under the standard first enunciated in *Douglas v. Veterans
> Administration* (5 MSPR 280 (1981)).  Under that 1981 decision, MSPB
> stated that it would evaluate agency penalties to determine not only whether
> they were too harsh or otherwise arbitrary but also whether they were
> unreasonable under all the circumstances.  In practice, this has meant that
> MSPB has exercised considerable latitude in modifying agency penalties.
> With this new, substantially more limited standard for MSPB mitigation of
> penalties selected by DHS, our intent is to explicitly restrict the authority of
> MSPB to modify those penalties to situations where there is simply no
> justification for the penalty.  MSPB may not modify the penalty imposed by
> the Department unless such penalty is so disproportionate to the basis for
> the action as to be wholly without justification.

70 Fed. Reg. at 5281.  According to the Agencies, because due process is preserved, these procedures

are "fair, efficient, and expeditious" and meet the statutory standards.

In addition, the new HR System identifies a preliminary list of "Mandatory Removal

Offenses" which are not subject to immediate MSPB review.  Should an employee discharged for

a Mandatory Removal Offense wish to appeal, that appeal would go to a Mandatory Removal Panel

("MRP"), composed of "independent, distinguished citizens," selected by the Secretary, 5 C.F.R.

§ 9701.708(a)(2), from a list that includes nominees from labor organizations and others.  *Id.*

§ 9701.708(c); *see* 70 Fed. Reg. at 5315.  Appeals from the MRP would go to the MSPB.  "In

conducting its review, MSPB will accept the findings of fact and interpretations of these regulations made by the MRP" and must issue its decision within 30 days.  70 Fed. Reg. at 5316.   Judicial review in the Federal Circuit would be provided under 5 C.F.R. § 9701.707(f), by reference to 5 U.S.C. § 7703.

## II.    LEGAL STANDARDS

### A.  Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   Summary judgment is not a "disfavored procedural shortcut"; rather, it is a reasoned and careful way to resolve cases fairly and expeditiously.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).   To determine whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

Once the moving party shows that there is a lack of evidence to support the opponent's case, the burden shifts to the non-movant to show, through affidavits or otherwise, the existence of a material issue for trial.  *Bias v. Advantage Int'l, Inc.*, 905 F.2d 1558, 1561 (D.C. Cir. 1990); *see Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (citing Fed. R. Civ. P. 56 (c)).  Conclusory allegations by the non-movant are insufficient to withstand summary judgment. *Exxon Corp. v. F.T.C.*, 663 F.2d 120, 127 (D.C. Cir. 1980) (citing *Marks v. United States Dep't of*

*Justice*, 578 F.2d 261, 263 (9th Cir. 1978)).

B.  Motion to Dismiss

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, which governs motions to dismiss for lack of subject matter jurisdiction, Plaintiffs bear the burden of establishing by a preponderance of the evidence that the Court possesses jurisdiction.  *See Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002); *Pitney Bowes, Inc. v. United States Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  It is well established that, in deciding a motion to dismiss for lack of subject matter jurisdiction, a court is not limited to the allegations set forth in the complaint, "but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case."  *Alliance for Democracy v. Fed. Election Comm'n*, 362 F. Supp. 2d 138, 142 (D.D.C. 2005); *see Lockamy v. Truesdale*, 182 F. Supp. 2d 26, 30-31 (D.D.C. 2001).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), on the other hand, challenges the adequacy of a complaint on its face, testing whether the plaintiffs have properly stated a claim.  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  The plaintiffs need not plead the elements of a *prima facie* case in the complaint.  *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).  In deciding a 12(b)(6) motion, the Court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice."  *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted).

The Agencies' motion to dismiss relies on both Rules 12(b)(1) and 12(b)(6).

C.  Administrative Procedure Act and *Chevron* Deference

Under the Administrative Procedure Act, the Court may set aside formal agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Agency decisionmaking is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).

The Court reviews the Agencies' interpretation of the HSA under the now-familiar *Chevron* framework.  *Chevron U.S.A. Inc. v. Natural Res. Def. Council Inc.*, 467 U.S. 837 (1984).  Under *Chevron*, if "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  But, if the statute is silent or ambiguous with respect to the issue at hand, then the Court must defer to the Agencies so long as their "answer is based on a permissible construction of the statute."  *Id.* at 843.

At *Chevron* step two, "a 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made; an explanation that is 'arbitrary, capricious, or manifestly contrary to the statute,' however, is not. *Northpoint Tech. Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005) (citations omitted); *see also Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000) ("[W]e have recognized that an arbitrary and capricious claim and a *Chevron* step two argument overlap . . . ."); *Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 726 (D.C. Cir. 1994) ("[T]he inquiry at the second

step of *Chevron* overlaps analytically with a court's task under the Administrative Procedure Act
. . . .").

## III.   ANALYSIS

To begin with the obvious, Congress clearly directed the Agencies to develop a new
HR System and they clearly had intentionally broad discretion throughout that process.  As relevant,
Congress required that the new HR System be "flexible," "contemporary," and that it "ensure"
collective bargaining rights.  Since Congress also permitted the Agencies to waive the application
of Chapter 77 (labor-management relations) of Title 5 altogether, should they have decided to do so,
the Unions' arguments that rely on Chapter 77 are not persuasive.

The Unions' stronger arguments are more fundamental and find their support in the
clarity of the HSA and the final Regulations.  The Court agrees that the new HR System has failed
at one of its basic requirements:  it does not ensure collective bargaining rights.  Because the HR
System elevates flexibility above the equal statutory requirement that it ensure collective bargaining
rights, and because the HR System improperly interferes with the FLRA and the MSPB, the Court
will enjoin its implementation.

The parties disagree on the necessary attributes of "collective bargaining."  However,
collective bargaining has at least one irreducible minimum that is missing from the HR System: a
binding contract. When good-faith bargaining leads to a contract that one side can disavow without
remedy, the right to engage in collective bargaining *ab initio* is illusory.   The HR System is also
flawed in its attempt to expand the jurisdiction of the FLRA by assigning it to review decisions of
the new Homeland Security Labor Relations Board.  Finally, the change to the mitigation standard
used by the MSPB fails to comply with the statutory direction that changes to Chapter 77 be "fair."

Each of these points is fundamental to the operation of the HR System and require that Subpart E

and 5 C.F.R. § 9701.706(k)(6) of Subpart G be enjoined.

A. <u>Standing</u>

The Government argues that the Plaintiff Unions do not have standing to challenge

any part of the HR System or the Regulations except the Management Rights provision at 5 C.F.R

§ 9701.511.

Standing to invoke the jurisdiction of the federal courts under Article III of the

Constitution requires a plaintiff to show that "(1) it has suffered an 'injury in fact' that is (a) concrete

and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly

traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v.

Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560-561 (1992)). An organization can assert standing on behalf of itself as an institution or on

behalf of its members. *See United Food & Commercial Workers Union Local 751 v. Brown Group*,

517 U.S. 544, 553 (1996) ("[A]n association has standing to sue on behalf of its members 'when (a)

its members would otherwise have standing to sue in their own right; (b) the interests it seeks to

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit.'") (quoting *Hunt v.

Washington Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). An injury that "affects the

organization's noneconomic interests" may be sufficient to establish standing. *Spann v. Colonial

Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990), *cert. denied*, 498 U.S. 980 (1990). Applying these

principles, this Court has previously recognized that federal-sector unions have standing to challenge

regulations that affect their abilities to represent the interests of their members in collective bargaining. *NTEU v. Devine*, 577 F. Supp. 738, 743-45 (D.D.C. 1983), *aff'd*, 733 F.2d 114 (D.C. Cir. 1984).

The Agencies do not contest these principles and acknowledge that a plaintiff has standing to challenge regulations that impose an "injury in fact" that is "fairly traceable" to a set of regulations and that can be redressed by the relief sought. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). Beyond the Management Rights provision at 5 C.F.R. § 9701.511, however, they argue that Plaintiffs offer only "unadorned speculation," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005), of a potential future injury arising from implemented directives under 5 C.F.R. § 9701.518(d)(1). Defs.' Reply at 5. According to the Agencies, Plaintiffs' challenge to 5 C.F.R. §§ 9701.506(a) and 9701.515(d)(5), which declare collective bargaining agreements unenforceable if inconsistent with the Regulations, directives, or polices, is premature because the Plaintiff Unions "do not allege the existence of any extant, *unexpired* [collective bargaining agreement] that might be affected." Defs.' Reply at 7. Later, however, the Agencies acknowledge that the terms of a collective bargaining agreement, unlike commercial contracts, continue to have binding effect after expiration of the contract. Defs.' Memorandum in Support of Motion to Dismiss ("Defs.' Mem.") at 49. More importantly, they do not dispute that the Regulations would erase any contract terms that are inconsistent with the Regulations, directives, or policies, now and in the future.[11]   The harm to the Plaintiff Unions and

---

[11] 5 C.F.R. § 9701.518(d) vests DHS with the authority, at any time and for any reason, to issue directives, policies, or regulations that supersede collective bargaining agreements. In addition, 5 C.F.R. § 9701.515(d)(5) allows an "authorized agency official" to void provisions in collective bargaining agreements that s/he deems to be inconsistent with the Regulations, directives or policies. Further, the Management Rights provision includes the right to "take

to their members constitutes a real injury that is fairly traceable to the Regulations.  An injunction preventing implementation of the Regulation would redress this injury.

The Agencies retort that the Plaintiffs' alleged injury is predicated on "layers of speculation" that DHS might negotiate a new collective bargaining agreement and then issue a directive or policy as authorized by the HR System that negates one or more of the agreement's terms.  Defs.' Reply at 8.  For this reason, they assert that the Plaintiffs' claims are based on a possible future injury that does not satisfy the requirements of Article III.  This argument is seriously flawed.  Under Subpart E of the HR System, DHS has reserved for itself the right to declare any part of any collective bargaining agreement null and void, not only through implementing directives but also whenever management thinks it "may be necessary to carry out the Department's mission." 5 C.F.R. § 9701.511(2).[12]  Thus, collective bargaining agreements would no longer be legally binding on the Secretary or enforceable by the Unions if management exercised its unreviewable discretion to declare some aspect of a contract inimical to the Department's mission.  Whether DHS actually declares a contract clause unenforceable next month or three years from now does not affect the

---

whatever other actions may be necessary to carry out the Department's mission," without regard to contract terms.  5 C.F.R. § 9701.511(a)(2).

[12]  A collective bargaining agreement is a special form of contract.  As with other contracts, however, the parties are normally bound to what they agreed.  Thus, in the federal sector, it is an unfair labor practice for an agency "to enforce any rule or regulation . . . which is in conflict with any applicable collective bargaining agreement if the agreement was in effect before the date the rule or regulation was prescribed." 5 U.S.C. § 7116(a)(7).  Under Subpart E of the HR System, however, "because these regulations provide that any provision of a collective bargaining agreement that is inconsistent with these regulations or the implementing directives is unenforceable on the effective date of coverage, [the Agencies] did not identify the action set forth in 5 U.S.C. 7116(a)(7) as an unfair labor practice. . . . [F]or reasons of homeland security, it is imperative that these regulations and any implementing directives trump provisions of existing collective bargaining agreements . . . ." 70 Fed. Reg. at 5310.

immediate legal injury: the Plaintiffs can no longer negotiate mutually binding collective bargaining agreements.  Their collective bargaining would be on quicksand, as the Department would retain the right to change the underlying bases for the bargaining relationship and absolve itself of contract obligations while the Unions would be bound.

It is no answer to argue that the Regulations impose a duty on the parties to "meet and negotiate in good faith," 5 C.F.R. § 9701.518(a), or that it would be an unfair labor practice if the Department refused to do so.  *See* 5 C.F.R. § 9701.517(a)(5); Defs.' Mem. at 4.  Under the Regulations, bargaining about management rights or the procedures by which management will exercise its rights is prohibited, 5 C.F.R. § 9701.511; the issuance of implementing directives, policies and regulations, as well as managerial or supervisory decisions that a contract term is inconsistent with the mission of the Agency, are specific management rights not subject to bargaining, *id.*; while DHS must "confer" with the Unions about procedures by which it will exercise management rights, the obligation to "confer" is not enforceable as an unfair labor practice, 5 C.F.R. § 9701.511(d); and the Department reserves the right to exercise management rights without limitation, 5 C.F.R. § 9701.511(f).  In other words, while DHS may be required to *bargain* in good faith, there is no effective way to hold it to that bargain.  Under such circumstances, a deal is not a deal, a contract is not a contract, and the process of collective bargaining is a nullity.  Certainly, the Plaintiff Unions have standing to complain, on behalf of themselves and on behalf of their members, about these intended and inevitable regulatory effects prior to implementation.  The harm to the Plaintiff Unions and to their members constitutes a real injury that is fairly traceable to the Regulations and a favorable decision would redress this injury.  This is all that is required to demonstrate Plaintiffs' standing. *See Friends of the Earth,* 528 U.S. at 180-81.

The Agencies also contest Plaintiffs' standing to challenge the establishment of the HSLRB because it is "speculative" that its members might be biased in favor of DHS.  Defs.' Reply at 8-9.  The Agencies have candidly stated that they have proposed the HSLRB because they want to avoid interference from outside DHS.  *See* 70 Fed. Reg. at 5307.  ("It is imperative that HSLRB retain jurisdiction over each matter for which an understanding and appreciation of the Department's mission is necessary.").  As a result, the HSLRB would be assigned important duties concerning interpreting management rights and the scope of bargaining, adjudicating related unfair labor practices, and resolving all bargaining impasses.  The Secretary would exercise unreviewable discretion to select or replace the members of the HSLRB.  Individual members of the HSLRB would be permitted to both investigate and decide disputes before them.[13]  Whether the Agencies have *authority* to promulgate this regulation raises a different question than the Plaintiff Unions'

---

[13]  This form of administrative agency – whereby the same individual can investigate and decide labor-management disputes – was rejected by Congress as unfair when it passed the Taft-Hartley Act in 1947, amending the National Labor Relations Act to create the position of General Counsel of the National Labor Relations Board as prosecutor and members of the NLRB as neutral adjudicators.  *See* 29 U.S.C. § 158(3)(d); Legislative History of the Labor Management Relations Act, 1947, Congressional Record, House–April 15, 1947, Remarks of Rep. Hartley ("Every one of us who has studied the administration of the National Labor Relations Act knows that . . . it has failed in larger degree by the improper administration by the members of the Board and their subordinates.  The National Labor Relations Board has been investigator, prosecutor, jury, and judge all rolled into one.  Under the pending bill we make it a quasi-judicial board which will pass on investigations and prosecutions that have been made by a separate administrator," *i.e.*, the General Counsel); *see also* House Report No. 245 on H.R. 3020, Vol. 1 at  296 (The proposed bill "abolishes the existing discredited National Labor Relations Board, and creates in lieu thereof a new board of fair-minded members to exercise quasi-judicial functions only, [and] [i]t establishes a new official to exercise the various prosecuting and investigative functions under the National Labor Relations Act, to be entirely independent of the Board."); House Conference Rept. No. 510 on H.R. 3020, Vol. 1 at 541 "([T]he investigating and prosecuting functions under the act" shall be exercised by the "General Counsel [who] is to have final authority to act in the name of, but independently of any direction, control, or review by, the Board in respect of the investigation of charges and the issuance of complaints of unfair labor practices, and in respect of the prosecution of such complaints before the Board.").

*standing* to challenge it.  The new HR System, and the HSLRB, will immediately affect the Plaintiffs as they prepare for the limited 60-day bargaining period to bring current terms into compliance.  The members of the HSLRB have not been identified but they would not be in place to address bargaining disputes during the limited bargaining period.  At the same time, the Regulations would deprive the FLRA of jurisdiction over any bargaining disputes.  If DHS declared that a topic were not a subject for collective bargaining, that declaration would stand until the HSLRB reviewed it, whenever HSLRB were up and running.  And then, it would be more "understanding" of DHS and its mission than the Agencies expect from the FLRA.  In addition, DHS asserts the authority to take action, with or without an agreement and with or without an impasse in negotiations.  There can be no serious question as to whether the establishment of the HSLRB – changing the authority of the FLRA, changing the bargaining obligations of DHS, changing the remedies available for implementation before impasse, and changing the entire scope of bargaining – will inescapably alter the Unions' roles, negotiating rights, and appeal rights as soon as the Regulations become effective.  The Court finds that the Plaintiffs clearly have standing to challenge the establishment of the HSLRB without waiting for the other shoe to drop.

The Agencies further argue that the Plaintiffs do not have standing to advance Count Two of the complaint, challenging 5 C.F.R. § 9701.510, which would limit FLRA jurisdiction to elections, some unfair labor practices, and review of HSLRB decisions under certain conditions.  Review of HSLRB decisions would be according to a standard of review determined by the Agencies and not by the FLRA.  5 C.F.R. § 9701.508(h)(1).  The Agencies assert that Plaintiffs "ask this Court to canvas the categories of labor disputes that *might* arise under the DHS regulations, and render an advisory opinion on which [disputes] fall within the FLRA's jurisdiction." Defs.' Reply at 10.  They

also suggest that "a court's ability to evaluate whether the FLRA has jurisdiction over a claim would clearly be advanced if it knew the nature of a particular claim [or else] . . . the Court could do little more than render an advisory opinion concerning FLRA's jurisdiction over a hypothetical labor dispute." Defs.' Mem. at 19.

To the contrary, the proposed change in FLRA jurisdiction has an immediate impact on the Plaintiff Unions and their members, as the nature of DHS's obligations to bargain would be immediately changed, access to the FLRA on critical aspects of the labor-management relationship would be immediately denied, and the entire collective-bargaining relationship would be immediately altered, just as the parties face critical but brief negotiations. There is no doubt that the change would deprive the Unions of an extra-agency adjudicator for bargaining disputes. The result of these changes would be concrete and immediate, not imaginary or potential. The issue here is not, as the Agencies posit, the impact of these changes on an individual case, but whether the Agencies have authority to impose standards of review and jurisdiction on the FLRA to decide compliance with DHS regulations *vel non*.

For similar reasons, the Agencies argue that the Plaintiff Unions do not have standing to challenge 5 C.F.R. § 9701.706(k)(6), which limits the jurisdiction of the MSPB to mitigate, or lessen, penalties for adverse actions. They suggest that the Complaint raises only "a generalized allegation that 'some' as yet unidentified employee may, at some indefinite time in the future, suffer injury (perhaps some form of harsher penalty)." Defs.' Reply at 11. This argument misconstrues Count 3 of the Complaint. Plaintiffs complain that the Agencies acted in excess of their powers when they sought to change MSPB's authority. This argument needs no specific instance of a harsher remedy to create standing. As regular litigants before the MSPB on behalf of DHS

employees, the Plaintiffs have immediate standing to complain of such a material change in that agency's normal standard and the deference to DHS judgments that it imposes before any individual employee is subject to an adverse action under the HR System.

Lastly, Count 4 complains that the Agencies have no authority to change internal MSPB processes, such as allowing decisions by summary judgment without a hearing, limiting discovery, and expediting timeframes. The Plaintiff Unions also challenge the Regulation's grant of review authority by the MSPB over the decisions of the Mandatory Removal Panel, in alleged violation of 5 U.S.C. § 1204(a), which provides the scope of MSPB review. These changes inevitably impact the Plaintiff Unions and their members and are legitimately subject to pre-enforcement APA review. *See OCUNUS DOD Employee Rotation Action Group v. Cohen*, 144 F. Supp. 2d 1, 7 (D.D.C. 2000) (finding that pre-enforcement challenges to draft DOD policy limiting employee rights are appropriate for judicial review under the APA**).**

B. Ripeness

The Agencies urge the Court to dismiss the Complaint because it is not ripe for consideration. They cite *National Park Hospitality Association v. Department of the Interior*, 538 U.S. 803 (2003), for the proposition that

> [a] regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

*Id.* at 808. Applying these principles, the Agencies argue that Count 1 claims only that a future directive may invalidate a future collective bargaining agreement and thereby rests upon "contingent

future events that may not occur as anticipated, or indeed may not occur at all." Defs.' Reply at 13 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  Count 2 is also allegedly premature because it is only an anticipatory challenge to FLRA's jurisdiction to review HSLRB opinions that "depends on their subject matter" and cannot yet be determined.  *Id.* at 16.  As to Count 3, the Agencies assert that MSPB retains "considerable discretion to apply the new [mitigation] rule on a case by case basis," *id.*, requiring a factual application of the rule prior to adjudication by a court. Finally, the Agencies state that Count 4 addresses adverse actions that might happen some day in the future and might then be appealed to MSPB but are surely not ripe now.  *Id.* at 17.

These arguments are not persuasive.  The Plaintiff Unions and their members face immediate loss of all bargained terms that are inconsistent with the Regulations and a massive deterioration of their rights to require management to bargain and to abide by the terms of the contracts it signs.  Whether their claims are ultimately successful is not, of course, the test.  They challenge the Agencies' assignment of authority to DHS to agree to collective bargaining agreements and then repudiate them.  This challenge does not depend on any specific instance of repudiation but on the immediate change to the bargaining relationship in which one side is bound to terms and the other is not.  Counts 2, 3, and 4 do not attack the application of the Regulations to specific disputes before the FLRA or MSPB but, rather, the attempt by Agencies in the Executive Branch to direct the functioning of independent adjudicative bodies.  The legal question posed by the Complaint concerns the source of the Agencies' authority to impose any rule of procedure or substance on the FLRA or MSPB.  These are pure questions of law that are ripe for decision now.

C.  Preclusion by the Civil Service Reform Act

The HSA clearly gives the Agencies the authority to waive application of Chapter 71

of Title 5, and they have explicitly done so. 5 C.F.R. § 9701.503 ("[T]he provisions of 5 U.S.C.

§ 7101 through § 7135 are waived with respect to [DHS employees] except as otherwise specified

in this part.").  Under the Regulations, the FLRA would have no jurisdiction to consider or to rule

upon any alleged unfair labor practice relating to management rights or the scope of bargaining

except by limited review of HSLRB decisions.[14]  Yet the Agencies argue to the Court that Chapter

71 explicitly authorizes the FLRA to adjudicate the enforceability of regulations that limit the scope

of an agency's duty to bargain and that the Court should defer to that forum.  *See AFGE v. Loy*, 367

F.3d 932, 935 (D.C. Cir. 2004) ("The district courts do not have concurrent jurisdiction over matters

within the exclusive purview of the FLRA.").

The Agencies' argument would carry more weight were it not for the clear terms of

the HSA.  First, Congress gave the Agencies specific authority to waive Chapter 71 of Title 5, which

establishes the FLRA.  They have, in significant measure, done so. As a result, the FLRA is without

jurisdiction to adjudicate the Plaintiffs' complaint.  Second, the HSA specifies that regulations issued

by the Secretary are subject to review under the APA "except as specifically provided in this Act,

in laws granting regulatory authorities that are transferred by this Act, and in laws enacted after the

date of enactment of this Act."  *See* HSA § 112(e)**.**  None of the exceptions applies to the

_____

[14]  The FLRA is to review HSLRB decisions that concern "(1) issues involving the scope
of bargaining and the duty to bargain in good faith, as well as [unfair labor practice] complaints
involving the duty to bargain in good faith and work stoppages which are currently brought
directly to the FLRA under 5 U.S.C. § 7105(a)(2)(E) & (G); (2) disputes over requests for
information currently heard directly by the FLRA as [unfair labor practices] under 5
U.S.C. § 7105(a)(2)(G); (3) exceptions to arbitration awards involving the exercise of
management rights and the duty to bargain currently heard by the FLRA under 5
U.S.C. § 7105(a)(2)(H); and (4) negotiation impasses currently heard by the FLRA's Federal
Service Impasses Panel under 5 U.S.C. § 7119." Defs.' Mem. at 55-56 (internal citations
omitted).

Regulations under review here.  By express congressional direction, therefore, the Complaint is properly before the Court as a review of rulemaking under the APA and not as a question of alleged unfair labor practices within the purview of the FLRA or an adverse action on appeal to the MSPB.

This conclusion is fully consistent with the precedent in this circuit.  A pre-enforcement challenge to new regulations "is not the typical sort of labor altercation between a federal employee and his federal employer" to which the exclusive administrative review processes of the Civil Service Reform Act ("CSRA") apply.  *NTEU v. Devine*, 577 F. Supp. at 745.  The D.C. Circuit agreed that exclusive FLRA review for "defined employment rights" is "quite different" from "pre-enforcement judicial review of rules."  *NTEU v. Devine*, 733 F.2d 114, 117 n.8 (D.C. Cir. 1984).  The APA has often been found to provide jurisdiction for a federal court to hear union challenges to agency regulations or policies of general application on the grounds that they were inconsistent with a statute or the Constitution.  *See, e.g.*, *NTEU v. Von Raab*, 489 U.S. 656 (1989) (constitutionality of Customs Service drug testing program); *NTEU v. Horner*, 869 F.2d 571 (Fed. Cir. 1989) (regulation governing pay increases); *NTEU v. Horner*, 854 F.2d 490 (D.C. Cir. 1988) (OPM rule exempting certain positions from competitive service); *OCUNUS*, 144 F. Supp. 2d at 7 (pre-enforcement challenge to regulations not precluded by CSRA).  Thus, the Plaintiff Unions properly bring this pre-enforcement challenge to the HR System.

With these preliminary matters resolved, the Court turns to the heart of the matter.

D.  <u>Count 1: Collective Bargaining</u>

The right of federal employees to engage in collective bargaining is set by statute and can clearly be expanded or contracted by Congress.  Here, Congress directed the Agencies to establish an HR System that would: "(1) be flexible; (2) be contemporary," and "(4) ensure that

employees may organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them, subject to any exclusion from coverage or limitation on negotiability established by law."  5 U.S.C. § 9701(b)(1)-(2), (4).  The statute does not define these terms.  What is clear from the legislative history, however, is that Congress gave the Secretary the responsibility to prevent and respond effectively to shifting threats posed by terrorism and to consolidate the operations of numerous agencies into a single cohesive Department.  *See, e.g.*, 148 Cong. Rec. S9195 (daily ed. Sept. 25, 2002) (statement of Sen. Miller); 148 Cong. Rec. H5814 (daily ed. July 24, 2002) (statement of Sen. Portman).  For these reasons, the Agencies were not required to comply with Chapter 71 of Title 5 and its regime for collective bargaining in the federal sector.

When Congress has not indicated another intent, the common meanings of statutory words can be assumed.  *See Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 388 (1993).  Thus, the Court interprets "flexible" in this context to mean "characterized by a ready capability to adapt to new, different, or changing requirements."  Merriam-Webster Online, *at* http://www.m-w.com (last visited July 31, 2005).  "Contemporary" will be applied according to its common meaning:  "marked by characteristics of the present period."  *Id.*  "Collective bargaining," however, is a term of art in the federal sector that has been defined by Congress in the FSLMRA, 5 U.S.C. § 7103(a)(12), and replicated in the Regulations (only changed to apply specifically to DHS):

> Collective bargaining means the performance of the mutual obligation of a management representative of the Department and an exclusive representative of employees in an appropriate unit in the Department to meet at reasonable times and to consult and bargain in a good faith effort to reach agreement with respect to the conditions of employment affecting such employees and to execute, if requested by either party, a written document incorporating any collective bargaining agreement reached, but the obligation referred to in this paragraph does not compel either party to agree to a proposal or to make a concession.

5 C.F.R. § 9701.504.[15] "Collective bargaining agreement" is defined with nearly identical terms in the FSLMRA and the Regulations as "an agreement entered into as a result of collective bargaining pursuant to the provisions of this subpart." *Compare* 5 U.S.C. § 7103(a)(8) *with* 5 C.F.R. § 9701.504. As a result, the Court concludes that the statutory and regulatory meaning of collective bargaining at DHS is consistent with its meaning under the FSLMRA.[16] This conclusion is supported by the fact that, elsewhere in the HSA, when Congress intended to deny collective bargaining rights and provide only advisory roles to employee representatives, it used different language. *Compare* 5 U.S.C. § 9701(b)(4) ("bargain collectively") *and* 5 U.S.C. § 9701(e)

---

[15] *See also* 29 U.S.C. § 158(d) (defining collective bargaining for the private sector):

> [T]o bargain collectively is . . . the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party . . . .

The "conditions of employment" over which the DHS parties may theoretically engage in collective bargaining are defined in the Regulation as "personnel policies, practices, and matters affecting working conditions – whether established by rule, regulation, or otherwise – except" political activities, position classifications, pay, and "[a]ny matters specifically provided for by Federal statute." 5 C.F.R. § 9701.504. This definition is significantly reduced in scope by the Management Rights provision at § 9701.511, quoted in the text above.

[16] Analyzing how Congress has used similar language in other statutes is a traditional tool of statutory construction. *See, e.g.*, *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991). "The general rule is perfectly well settled that, where a statute is of doubtful meaning . . . the court may look into prior and contemporaneous acts . . . to determine its proper construction." *Hamilton v. Rathbone*, 175 U.S. 414, 419 (1899); *see also United States v. Wilson*, 290 F.3d 347, 359 (D.C. Cir. 2002). The guiding principle is that "[a] prior statute's definition of the term will control if it is natural and reasonable to think that the members of the legislature, in drafting the new statute, were influenced by the prior statute." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 823-24 (3d Cir. 1999).

("collaborate" or "consult" through "meet and confer" process) *with* 5 U.S.C. § 7113 ("national consultation rights").

    1.  <u>Do the Regulations "ensure" collective bargaining?</u>

        The Plaintiff Unions argue that every system of collective bargaining ever established by Congress has had three critical components: 1) a requirement that labor and management bargain in good faith over conditions of employment for purposes of reaching an agreement; 2) a provision that the agreements reached as a result of bargaining are binding on both parties equally; and 3) the establishment of a neutral forum for resolving disputes. *See* Pls.' Mem. at 13.  They argue that "[n]one of the[se] core elements . . . is present in the DHS scheme, in clear contravention of Congress' intent." *Id.* at 31.  They note:

> DHS has no obligation to bargain at all over important conditions of employment, even as to procedural matters.  It is empowered to make unilateral changes in conditions of employment without even providing the Union[s] with advance notice.  Moreover, DHS can take any matter off the bargaining table merely by issuing a directive.  It can even abrogate agreements that it has already entered, through the same device.  Finally, even when DHS violates the limited obligations imposed upon it, the body delegated the authority to decide collective bargaining disputes and resolve impasses is an arm of management, rather than an independent neutral.

*Id.*  The Agencies respond that they were authorized by Congress to waive the requirements of Chapter 71, including resort to the FLRA for bargaining disputes, and that they had to reconcile the competing requirements that the HR System be "flexible," "contemporary," and "ensure . . . collective bargaining."  *See* Defs.' Mem. at 36.  They argue, "Because defendants' construction of these provisions is at the very least a reasonable interpretation, it must be upheld under [*Chevron*]."  Defs.' Reply at 22.

        The Court agrees that Congress gave the Agencies wide latitude in designing a new

HR System for DHS.  Without doubt, however, that System must ensure employee rights to engage

in collective bargaining.  "Collective bargaining" means negotiation by a representative of a group

of employees with their employer in order to reach a contract covering terms and conditions of

employment.  There is no dispute over this definition; the Regulations adopt this precise meaning.

*See* 5 C.F.R. § 9701.504.  While a collective bargaining agreement is a specialized form of contract,

it retains the essential features of all contracts: "A contract is a promise, or a set of promises, for

breach of which the law gives a remedy, or the performance of which the law in some way

recognizes as a duty."  Samuel Williston, *A Treatise on the Law of Contracts* § 1, at 1-2 (Walter H.E.

Jaeger ed., 3d ed. 1957), *quoted in* Black's Law Dictionary 341 (8th ed. 2004).  The *sine qua non*

of good-faith collective bargaining is an enforceable contract once the parties reach agreement.  The

HR System does not lead to enforceable contracts and thus fails to comply with the directions of

Congress to ensure employee collective-bargaining rights.

The Regulations fail because any collective bargaining negotiations pursuant to its

terms are illusory: the Secretary retains numerous avenues by which s/he can unilaterally declare

contract terms null and void, without prior notice to the Unions or employees and without bargaining

or recourse.  Under the Regulations, DHS would have the power to take any matter off the

bargaining table simply by issuing department-wide directives, policies, or other regulations.[17]

HSLRB could issue binding Department-wide opinions without regard to the terms of collectively

bargained agreements.  *See id.* § 9701.509(b).  DHS managers have also reserved the right to "take

_____

[17]  *See* 5 C.F.R. § 9701.518(d). The Court finds an important distinction between a
"government-wide" regulation which might invalidate a contract term and a "Department-wide"
regulation.  In the latter case, the very entity which committed itself to contract terms has used its
discretion to invalidate those terms; in the former case, the actor is outside the scope of the
collective-bargaining relationship.  *See* Defs.' Reply at 27.

whatever other actions may be necessary to carry out the Department's mission," *see id.* § 9701.511(a)(2), without bargaining or prior notice, irrespective of the terms of collective bargaining agreements.[18] These unilateral actions could be appealed to the HSLRB but "[p]rovisions that are identified by the Department as unenforceable remain unenforceable unless held otherwise by the HSLRB on appeal," 5 C.F.R. § 9701.506(a), and the HSLRB is required to give "great deference" to the Secretary's interpretation of management's authority. *See id.* § 9701.106(a)(2).

The Comments to the Final Regulations make clear the breadth and depth of this retained right to breach the collectively bargained agreements approved by the Secretary:

- "[W]e have modified the regulation to provide for a 60-day period during which the parties to a collective bargaining agreement would bring conflicting and other impacted provisions into conformance [with the Regulations]. We have also provided that the Secretary may exercise his or her discretion to continue certain contract provisions as appropriate and to cancel such provisions at any time." 70 Fed. Reg. at 5306.

- "[T]he regulations have been revised to require bargaining over impact and appropriate arrangements after implementation under certain circumstances . . . . The regulations continue to require bargaining over implementation, impact, procedures, and appropriate arrangements regarding the exercise of nonoperational management rights . . . . We added paragraph (f) [to Management Rights] to clarify that nothing prevents management from taking action, and that any agreements over impact or appropriate arrangements are neither retroactive nor precedential." *Id.* at 5308.

- "[Management will 'confer' over procedures to guide its exercise of its management rights but] the process established under this section is beyond the scope of the unfair labor practice provisions of these regulations, and the Department retains final authority to determine the content of these operational procedures as well as the

---

[18]   The Agencies try to avoid this conclusion by arguing that the FLRA has defined the word "necessary," as in actions "necessary" to carry out the agency's mission. Defs.' Reply at 25. The problem with this logic is that the Regulations waive the application of FLRA jurisdiction over collective bargaining and management rights and make no exception for any of its prior decisions. There is no reason under the Regulations for DHS managers to conclude that it is limited in scope by some prior, non-applicable FLRA decision, as the Agencies would have the Court conclude.

authority to deviate from them." *Id.*

- "[W]e revised the proposed regulations to provide the exclusive representative with an opportunity to be present at meetings between Department representatives and bargaining unit employees when the purpose of the meeting is to discuss and/or announce new or substantially changed personnel policies, practices, or working conditions." *Id.* at 5309.

- "[As to implementing directives,] we have revised the regulation to provide for labor organization involvement in three ways: (1) With respect to Departmental implementing directives, the Department will provide appropriate labor organizations with an opportunity to participate in the 'continuing collaboration' process under § 9701.105; (2) with respect to other Departmental regulations dealing with conditions of employment, the Department will confer with labor organizations granted national consultation rights . . . ; and (3) with respect to all other Department-wide matters that impact bargaining unit members, the Department will consult with national labor organizations." *Id.* at 5310.

- "[U]nder 5 U.S.C. chapter 71, negotiated agreements over appropriate arrangements [for employees affected by the exercise of a management right] are binding, under the assumption that those agreements have anticipated future changes. Once again, today's operational environment belies that assumption. Not only are changes necessitated by operational demands constant, but they are also of almost infinite variety. Our frontline managers and supervisors must not be bound by past agreements when they must face current and future exigencies." *Id.* at 5279

- "Management has no obligation to bargain over a change to a condition of employment unless the change is otherwise negotiable pursuant to these regulations and is foreseeable, substantial, and significant in terms of both impact and duration on the bargaining unit, or on those employees in that part of the bargaining unit affected by the change. . . . Nothing in . . . this section prevents or delays management from exercising the rights enumerated in § 9701.511." *Id.* at 5339.

These Comments emphasize the degree to which the Agencies have concluded that the Secretary at DHS, and its managers and supervisors, need flexibility to run the Department. They also emphasize how collectively bargained agreements will not bind the Department. The Court interprets the first of these broad statements to establish a 60-day period for bargaining to bring current collective-bargaining agreements into compliance with the Regulations, subject to the Secretary's discretion

to pick and choose as to which current terms will continue in effect or to terminate such terms without notice. The second bullet would allow management to take action without regard to notice or negotiations over the impact of its exercise of management rights or appropriate arrangements for employees affected by its actions; in addition, any agreements reached concerning impact or appropriate arrangements would not be precedential or binding if the Department acted in an identical fashion a second time. The third bullet emphasizes that the Secretary retains total discretion on how to exercise management rights while the Regulations' promise that DHS will "confer" on these subjects with the Unions is not enforceable. The fourth bullet would allow an exclusive bargaining representative to be present when management announces a new personnel policy (which is subject to collective bargaining after the fact) but assures no prior notice or prior bargaining. The fifth bullet limits the Department's obligations to "consult" or "confer" with the Unions concerning implementing directives. The sixth bullet emphasizes that the flexibility to exercise management rights extends to managers and supervisors, without limitation from any earlier agreements on appropriate arrangements for affected employees. The final bullet limits management's obligation to bargain only to those changes that have a significant and substantial impact on affected employees that is foreseeable and of significant and substantial duration, with the caveat that no bargaining obligation will prevent or delay management from taking action under its management-rights clause.

These Comments expand upon the Management Rights provision of the Regulations, which would allow Department managers and supervisors "to take whatever other actions may be necessary to carry out the Department's mission." 5 C.F.R. § 9701.511(a)(2). Management is prohibited from bargaining over the exercise of any authority under its Management Rights and

prohibited from bargaining over the procedures it will observe in exercising these authorities, including the right to "take whatever actions may be necessary." 5 C.F.R. § 9701.511(a)(2), (b).

The HR System would allow the Plaintiff Unions to "confer" with DHS management concerning the procedures it will use when it exercises any management right. "Conferring" is clearly not collective bargaining. DHS pledges only to "consider [the Unions'] views and recommendations" on its exercise of management rights. 5 C.F.R. § 9701.512(a). However, the obligation to confer is not enforceable, imposes no duty to bargain or consult, and is not subject to impasse procedures. *Id.* After conferring, "[m]anagement retains the sole, exclusive, and unreviewable discretion to determine the procedures it will observe." 5 C.F.R. § 9701.512(d).

Under the HR System, the final results of collective bargaining would be essentially the same as the results of conferring: the Department would retain the sole and exclusive right to ignore the terms of its collective bargaining agreements whenever it believed necessary, subject only to HSLRB review under the Agencies' Rule of Construction,[19] and an extremely deferential FLRA review on appeal. A contract that is not mutually binding is not a contract. Negotiations that lead to a contract that is not mutually binding are not true negotiations. A system of "collective bargaining" that permits the unilateral repudiation of agreements by one party is not collective

---

[19] *See* 5 C.F.R. § 9701.502, mandating application of 5 C.F.R. § 9701.106, which provides:

> This part must be interpreted in a way that recognizes the critical mission of the Department. Each provision of this part must be construed to promote the swift, flexible, effective day-to-day accomplishment of this mission, as defined by the Secretary or designee. The interpretation of the regulations in this part by DHS and OPM must be accorded great deference.

5 C.F.R. § 9701.106(a)(2).

bargaining at all.  In this respect, no deference is due to the Agencies because "Congress has directly

spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, and directed that the Agencies

ensure employee rights to engage in collective bargaining.

2.  <u>Do the Regulations impermissibly reduce topics for bargaining?</u>

The Plaintiff Unions also challenge the limited scope of bargaining allowed under the

new HR System.  They note that the Regulations eliminate all bargaining over what were formerly

"permissive" subjects – the Regulations actually prohibit bargaining over such topics as numbers,

types, and grades of employees assigned to any subdivision or work project; tours of duty;

technology; and means and methods of doing work.  *Compare* 5 C.F.R. § 9701.511(a)(2) *with* 5

U.S.C. § 7106(b)(1).  Further, the Regulations would permit DHS to avoid bargaining with the

Unions over the procedures management will observe when exercising its management rights,

reducing their involvement to non-binding meetings to "confer."

While the Unions' observations are correct, the Court finds that Congress gave the

Agencies the authority to ignore the provisions of Chapter 71 and to establish new metes and bounds

for collective bargaining at DHS.  The HR System essentially reduces collective bargaining to

employee-specific terms affecting discipline, discharge and promotion.  "Appropriate arrangements"

for employees impacted by the exercise of a management right would be negotiated only *after* the

Department takes action and would be severely limited to such matters as personal hardships and

safety measures, or reimbursement of out-of-pocket expenses.  It is true that the "eradication of

virtually all bargaining over 'operational' issues will have a dramatic effect upon the work lives of

the employees the plaintiffs represent."  Pls.' Mem. at 36-37.  The HSA specifies that the Agencies

were to create the new HR System "[n]otwithstanding any other provision" of, *inter alia*, Chapter

71.  5 U.S.C. § 9701(a).  This phrase "can only reasonably be taken to mean that Congress intended

the [agency] to be unconstrained by the negotiation provisions of the FSLMRS."  *AFGE v. FLRA*,

46 F.3d 73, 78 (D.C. Cir. 1995).  The Agencies are entitled to *Chevron* deference for their decisions

on subjects for collective bargaining in the context of the Department, its mission, and this five-year

period of experimentation.

### 3.  Do the Regulations impermissibly establish the HSLRB?

The placement of the HSLRB as the arbiter of bargaining obligations and bargaining

impasses is challenged by the Unions as inconsistent with the traditional concept of "collective

bargaining."  *See* 5 C.F.R. § 9701.508.  The HSLRB would adjudicate all disputes concerning the

scope of bargaining, the duty to bargain in good faith, and related unfair labor practices; information

request disputes; exceptions to arbitration awards in cases involving the exercise of management

rights or the duty to bargain; and negotiation impasses.  *See id.* § 9701.509(a)(1)-(6).  It would also

have the authority to "[a]ssume jurisdiction over any matter concerning Department employees that

has been submitted to the FLRA . . . if the Board determines that the matter affects homeland

security."  *Id.* § 9701.509(a)(7).  It would have the power to issue "binding, Department-wide

opinions."  *Id.* § 9701.509(b).  The members of the HSLRB would be selected by the Secretary and

may be removed or re-appointed by the Secretary.  *See id.* § 9701.508(a)-(c).

Some of the Unions' arguments go to the fundamental integrity of the HSLRB

members whose independence from the Secretary can only be assessed when they start to act.  The

legal question is whether the Agencies had authority to establish the HSLRB or, as presented by the

Plaintiffs, whether the concept of "collective bargaining" requires an outside neutral adjudicator for

labor disputes.  The Court concludes that the Plaintiff Unions put more meaning into the term

collective bargaining than it can bear.  Whether a collective bargaining system has more credibility when truly neutral outsiders adjudicate disputes seems to have been decided in the affirmative when Congress passed the Labor-Management Relations Act in 1947.   *See* note 13, *supra*.  But by deliberately and clearly giving the Agencies the authority to establish an HR System for DHS without reference to the FLRA or any other adjudicative system for labor-management disputes, Congress left it to the Executive Branch to formulate that system.  The Unions' arguments go to the policy choices made by the Agencies and not their legal instructions from Congress.  The Agencies have explained their reasons for wanting a review body that would "understand" the mission of DHS.  The reasoning may be thin but it stands in contrast to the absence of any requirement that DHS adopt a different approach.  The Court cannot override the Agencies' entitled *Chevron* deference because the Plaintiff Unions disagree as a matter of policy.

4.  Conclusion on Count 1.

The Regulations fail in their obligation to ensure collective bargaining rights to DHS employees.  This obligation is equal to the Agencies' obligation to develop an HR System that is "flexible" and "contemporary."  Congress made protection of the right to bargain collectively an independent statutory requirement.  It did not give the Agencies discretion to sacrifice collective bargaining in the interests of flexibility, any more than it authorized them to rely upon "flexibility" to waive merit system principles or other rights.  *See* 5 U.S.C. § 9701(b)(3).  Thus, while the Agencies might be entitled to deference in filling in the details of a collective bargaining system, they were not permitted to create a system that is not "collective bargaining" at all.  Collective bargaining that leads to a contract that can be unilaterally disavowed by one party during its term without notice, without bargaining, and without legitimate recourse to review, equates to the right

to "meet and confer."  Since this system is contrary to the express direction of Congress, it is subject to an injunction against implementation.

E.  Count 2: Role of FLRA

Under normal circumstances, the FLRA has the statutory obligation to "conduct hearings and resolve complaints of unfair labor practices."  5 U.S.C. § 7105(2)(G).  This authority, however, is plainly limited by the statutory text to "matters under" or "provided in" Chapter 71 of Title 5.  *Id.* § 7105(a)(1), (2).  It is also plain that the HSA permits the Agencies, for the purpose of crafting the HR System, to modify—or to waive entirely—the usual FLRA role embodied in Chapter 71.  The HSA provides that the HR System shall "not waive, modify, or otherwise affect . . . any other provision of this part (as described in subsection (c))."  5 U.S.C. § 9701(b)(3)(D).  Subsection (c), in turn, lists various "nonwaivable provisions," but excludes Chapter 71.  *Id.* § 9701(c).  Thus, it follows that the Agencies may "waive, modify, or otherwise affect" the Chapter 71 requirements.

The Regulations provide that the FLRA may "[c]onduct hearings and resolve complaints of unfair labor practices under [5 C.F.R. § 9701.514(a)(1)-(4), (b)(1)-(4)] and in accordance with the provisions of 5 U.S.C. [§] 7118, which is not waived for this purpose but which is modified to apply to this section."  5 C.F.R. § 9701.510.  With respect to the eight unfair labor practices listed at § 9701.514(a)(1)-(4) and (b)(1)-(4), which are only slightly redefined in the Regulations, the Court agrees that the Agencies acted fully within the implicit grant of authority in 5 U.S.C. § 9701(b)-(c) to "modify" Chapter 71.

But the Regulations, in fact, go much further.  FLRA would be assigned an appellate role to review the decisions of the HSLRB.  This change would redefine FLRA's obligations in two fundamental ways.  First, because – in its new role – the FLRA would merely be reviewing HSLRB

and DHS compliance with Chapter 97 regulations, it would not be performing its traditional duty to "conduct hearings and resolve complaints of unfair labor practices" under Chapter 71. *See* 5 U.S.C. § 7105(2)(G). Second, because the Regulations promulgated pursuant to Chapter 97 substantially redefine DHS's bargaining obligations (including its duties vis-à-vis information requests and impasse), the matters the FLRA would review would no longer fall "under" or "in" Chapter 71. *See id.* § 7105(a)(1), (2).

An understanding of the HSLRB-FLRA review procedure illustrates these points. The Regulations would essentially replace the role ordinarily performed by FLRA, an independent agency created by statute, with HSLRB, a new review body created by regulation and situated within DHS. HSLRB would: directly resolve any unfair labor practice charges involving management rights and the scope of the duty to bargain; handle all disputes concerning negotiability and information requests; hear exceptions from arbitration awards dealing with management rights and the duty to bargain; and decide all impasse cases. 5 C.F.R. § 9701.509(a)(1), (3), (4). The Regulations redefine the scope of the Department's obligations in all of these areas and do not merely track the analogous language from Chapter 71.

Rather than conducting hearings in the first instance, the FLRA would then review the decisions of the HSLRB. However, its new appellate functions would dramatically change its traditional factfinding and adjudicatory roles. Under the Regulations, the FLRA

> must defer to findings of fact and interpretations of this part made by HSLRB and sustain the HSLRB's decision unless the requesting party shows that the HSLRB's decision was [arbitrary, capricious, an abuse of discretion, based on error in applying the HSLRB's procedures, or unsupported by substantial evidence].

*Id.* § 9701.508(h)(1)(i)-(iii).   Thus, rather than exercising its independent judgment in resolving complaints, the FLRA would only review the decisions of the HSLRB regarding DHS compliance with regulations promulgated pursuant to Chapter 97, not the statutory commands in Chapter 71.

In response to the Unions' argument that the FLRA would be required to interpret and apply DHS regulations, the Agencies first say, "[t]his is simply not the case," Defs.' Reply at 56-56, but then admit that "when the FLRA reviews an HSLRB decision in a ULP case involving the scope or duty to bargain, it must apply the new regulation." *Id.* at 32.  Despite this about-face, the Agencies argue that "this merely modifies provisions that the FLRA must apply to cases that fall within its existing jurisdiction under Chapter 71. . . . Such modifications do not assign the FLRA new duties." *Id.* at 32-33 (footnotes omitted); *see also id.* at 32 (arguing that FLRA review of HSLRB decisions does not exceed the scope of 5 U.S.C. § 7105 "because each category of dispute that the FLRA will review falls within a specific provision of Chapter 71"); *id.* at 56 ("Every matter heard by the FLRA under the new system – either directly or through its review of HSLRB decisions – falls within the scope of its powers and duties under Chapter 71.").  In essence, the Agencies argue that any changes are mere modifications, and that the FLRA's new review function "falls comfortably within the scope of the FLRA's existing responsibilities under Chapter 71." *Id.* at 55.  The Court is not persuaded.

It is agreed that DHS may "waive, modify, or otherwise affect" the Chapter 71 requirements. But the changes wrought by the Regulations in this regard cannot be said simply to "modify" or "affect" the FLRA's jurisdiction and duties; rather, they fundamentally change the obligations of an independent agency.  It is now well established that the term "modify" connotes moderate, not fundamental, change. *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 228 (1994).  As the

Supreme Court has explained in a similar context, "Virtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion." *Id.* at 225; *see also id.* at 225-26 & n.3 (surveying Random House, Webster's, Oxford, and Black's Law dictionaries). Moreover, the Court is left without doubt that "affect" connotes an even lesser degree of change. *See, e.g.*, Black's Law Dictionary 62 (8th ed. 2004) ("Most generally, to produce an effect on; to influence in some way.").

In short, the Agencies' modifications to Chapter 71, as embodied in the Regulations, "can be justified only if [they] make[] a less than radical or fundamental change." *MCI*, 512 U.S. at 229. Of course, "whether a change is minor or major depends to some extent on the importance of the item changed to the whole." *Id.* Here, the Regulations: dramatically alter DHS's bargaining obligations; permit FLRA review of HSLRB decisions for compliance with Chapter 97 regulations, not Chapter 71 statutory text; impose an appellate role foreign to the FLRA; and require a highly deferential standard of review at odds with FLRA's status as an independent agency. Though the Agencies were not required to use FLRA—in fact, they could have waived Chapter 71 entirely—the Court is convinced that they cannot commandeer the resources of an independent agency and thereby fundamentally transform its functions, absent a clearer indication of congressional intent.

"[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." *Id.* (citing *Pittston Coal Group v. Sebben*, 488 U.S. 105, 113 (1988)). Because the Regulations would work fundamental changes to FLRA that extend beyond the Agencies' statutory authority to "modify" or "affect" Chapter 71, they fail under the first step of *Chevron*.

F.  Count 3: MSPB Mitigation of Penalties

Count 3 of the Complaint challenges the Agencies' authority to change the MSPB standard by which the MSPB might mitigate (lessen) the penalty for employee misconduct.  The Regulations clearly intend to do so:

> Given the Department's need to maintain an exceptionally high degree of order and discipline in the workplace, an arbitrator, adjudicating official, or MSPB may not modify the penalty imposed by the Department unless such penalty is so disproportionate to the basis for the action as to be wholly without justification . . . . When a penalty is mitigated, the maximum justifiable penalty must be applied.

5 C.F.R. § 9701.706(k)(6).  The Plaintiff Unions allege that the regulation violates 5 U.S.C. § 9701(f)(2)(C), which provides that any regulations under § 9701 "shall modify procedures under chapter 77 only insofar as such modifications are designed to further the fair, efficient, and expeditious resolution of matters involving the employees of the Department."

The Agencies argue that they are not constrained by § 9701(f)(2) because the MSPB mitigation standard is not derived from Chapter 77 but instead from Chapter 75 where, at 5 U.S.C. § 7513(a), the law states that "an agency may take an adverse action against an employee 'only for such cause as will promote the efficiency of the service.'"  Defs.' Reply at 36.  The Agencies' analysis is erroneous.  Chapter 75 prescribes the procedures that *employing* agencies must follow when they take an adverse personnel action against one of their own employees, as the Defendants actually acknowledge in the language quoted above.  It is Chapter 77 that sets forth the procedures that *MSPB* must follow in reviewing the decisions of employing agencies and it is Chapter 77 that includes a provision authorizing the MSPB to provide remedies to injured employees.  5 U.S.C. § 7701(b)(2)(A) ("[T]he employee or applicant shall be granted the relief provided in the decision

. . . .").  In addition, 5 U.S.C. § 7701(3), which addresses appeals of adverse actions against members

of the Senior Executive Service, states that MSPB has "authority to mitigate the personnel action

involved [with a member of the SES] . . . , subject to the same standards as would apply in an appeal

involving an action" against a member of the competitive service "with respect to which mitigation

authority *under this section* exists."  *Id*. § 7701(b)(3) (emphasis added).

        The provisions in the HSA relating to appellate procedures strongly support this

conclusion.  *See id*. § 9701(f).  The Chapter to which Congress was speaking when it addressed

appeals of adverse actions and authorized changes that meet certain requirements was Chapter 77.

The "sense of Congress" was that DHS employees "are entitled to fair treatment in any appeals that

they bring in decisions relating to their employment."  5 U.S.C. § 9701(f)(1)(A).  For this reason,

among the "Requirements" set by Congress are obligations for the Agencies to confer with MSPB;

to ensure due process; to provide, as "practicable," for expeditious handling of DHS appeals; and

to modify "procedures under chapter 77" only to the extent that the modifications "further the fair,

efficient, and expeditious resolution of matters" involving DHS employees.  *Id*. § 9701(f)(2)(C).

Clearly, Congress anticipated that any changes affecting employee appeals of adverse actions would

occur within the context of Chapter 77 – and that the statutory requirements of fairness, expedition,

and efficiency would apply to such changes.[20]

        The case law cited by the Agencies does not require a different result.  MSPB has so

interpreted its own statute in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (M.S.P.B. 1981).

---

[20]  The Court notes that the requirement that changes be "fair" is in addition to, and
thereby presumed to have a meaning different from, the requirement that the Regulations ensure
due process.  *Compare* 5 U.S.C. § 9701(f)(2)(B)(i) (due process) *with* 5 U.S.C. § 9701(f)(2)(C)
(fair).

*Lisiecki v. MSPB*, 769 F.2d 1558 (Fed. Cir. 1985), *cert. denied*, 475 U.S. 1106 (1986), is not to the

contrary.  *Lisiecki* addressed whether MSPB's mitigation authority extended to matters concerning

unacceptable performance under Chapter 43 of the CSRA, which is not at issue here.  In *Lachance*

*v. Devall*, 178 F.3d 1246 (Fed. Cir. 1999), the Federal Circuit explicitly stated that the MSPB's

mitigation authority arises "pursuant to 5 U.S.C. § 7701(c)(3)."  *Id.* at 1253.  It is true, as the

Agencies argue, that "the efficiency of the service is the ultimate criterion for determining both

whether *any* disciplinary action is warranted and whether the *particular* sanction may be sustained."

Defs.' Reply at 38 (quoting *Douglas*, 5 M.S.P.R. at 303) (emphasis added by Defendants).  The

Agencies conclude that "nothing in Chapter 77 establishes any standard for determining whether to

mitigate a penalty."  Defs.' Reply at 39.  This argument misses the mark.  The question is the

statutory locus of MSPB's authority to mitigate penalties in adverse action cases; if that authority

is found within Chapter 77, as the Court has concluded, the Agencies may not interfere with MSPB's

exercise of that authority unless their modification meets the requirements of the HSA.

        The Agencies argue in the alternative that the modification to MSPB's mitigation

authority fully meets the statutory requirements.  The preamble to the Regulations acknowledges that

it was their intention to create a "new, substantially more limited standard for MSPB mitigation of

penalties selected by DHS" so that mitigation would occur only "where there is simply no

justification for the penalty."  70 Fed. Reg. at 5281.  Before this Court, the Agencies argue that they

"simply share the view of the courts," Defs.' Reply at 40, that DHS, as the employing agency, "is

in the best position to judge the impact of the employee misconduct upon the operations of the

agency, the prospects for the employee's rehabilitation and improvement, and the need to maintain

and encourage high standards of conduct by all employees."  *Beard v. Gen. Servs. Admin.*, 801 F.2d

1318, 1321 (Fed. Cir. 1986); *see* 70 Fed. Reg. at 5281 ("[T]he Department bears full accountability

for homeland security [and] it is in the best position to determine the most appropriate adverse action

for poor performance or misconduct."). For this reason, the Regulations would require MSPB and

arbitrators to apply a standard that is "substantially similar to the standard applied by the Federal

Circuit in reviewing penalty determinations." Defs.' Reply at 39.[21]

There is a serious flaw in this argument. In each of the cases cited by the Agencies

to support its standard, the Federal Circuit was reviewing a decision of the MSPB, pursuant to 5

U.S.C. § 7703(c),[22] and not directly the decision of the employing agency that had administered an

adverse action. In each instance, MSPB had already determined under its normal standard of

reasonableness that it would *not* mitigate the penalty. In that context, the Federal Circuit sustained

MSPB's decisions under the standards of § 7703(c) and agreed with MSPB's deference to agency

decisions. The Federal Circuit has also approved of the *Douglas* analysis and the factors applied by

---

[21] The Agencies cite *Bryant v. Nat'l Science Found.,* 105 F.3d 1414, 1416 (Fed. Cir. 1997) (quoting in part *Yeshick v. DOT*, 801 F.2d 383, 384-385 (Fed. Cir. 1986)) ("we cannot disturb the penalty chosen by the agency unless it is so 'outrageously disproportionate' to the charged offense . . . as to constitute an abuse of discretion"); *Parker v. U.S. Postal Service*, 819 F.2d 1113, 1116 (Fed. Cir. 1987) ("deference is given to the agency's judgment unless the penalty . . . is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion") (quoting *Villela v. Dep't of the Air Force*, 727 F.2d 1574, 1576 (Fed. Cir. 1984)); *Lachance*, 178 F.3d at 1251 ("we will not disturb a choice of penalty within the agency's discretion unless the severity of the agency's action appears totally unwarranted in light of all the factors") (quoting *Mings v. DOJ*, 813 F.2d 384 (Fed. Cir. 1987)).

[22] The court is required to sustain the decision of the MSPB unless it is found to be (1) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (2) obtained without procedures required by law, rule or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c). "In determining whether the [MSPB's] decision is supported by substantial evidence, the standard is not what the court would decide in a *de novo* appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole." *Parker v. U.S. Postal Serv.*, 819 F.2d 1113, 1115 (Fed. Cir. 1987).

MSPB in that agency's decisions whether to mitigate a penalty:

> The [MSPB] held [in *Douglas*] that it has "authority to mitigate penalties when [it] determines that the agency-imposed penalty is clearly excessive, disproportionate to the sustained charges, or arbitrary, capricious, or unreasonable . . . .
>
> . . . .
>
> . . . Petitioner's failure to perform assigned duties clearly justifies adverse agency action, and the choice of an appropriate 'penalty' is a matter of agency discretion. *Boyce v. United States*, 543 F.2d 1290, 1292 (Ct. Cl. 1976). We cannot agree with petitioner that removal for what the [MSPB] found to be an 8-month period of self-imposed idleness was clearly excessive or an abuse of discretion.

*Nagel v. Dep't of Health and Human Servs.*, 707 F.2d 1384, 1386-87 (Fed. Cir. 1983). Thus, the Agencies are not "simply shar[ing] the view of the courts" when they seek to adopt a more stringent standard by which MSPB would make its mitigation determinations. In the cited cases, the Federal Circuit found that MSPB had already given appropriate deference to the employing agency when it decided not to mitigate those penalties.

The Court now turns to whether the new mitigation standard is supported by the HSA. Modifications within the purview of Chapter 77 must be "designed to further the fair, efficient, and expeditious resolution of matters involving the employees of the Department." 5 U.S.C. § 9701(f)(2). As a legal matter, "fair" means "impartial; just; equitable; disinterested." Black's Law Dictionary 633 (8th ed. 2004). To be "efficient" is to be "productive without waste." Merriam-Webster Online, *at* http://www.m-w.com (last visited Aug. 4, 2005). To be "expeditious" is to be prompt or speedy. *Id.* In lay terms, Congress authorized the Agencies to change Chapter 77 only insofar as the changes would be impartial, without wasted actions, and fast.

The Court finds that the desire of the Agencies to restrict MSPB review results in a

system that is not fair.  First, the Court seriously doubts that by insisting on fairness, the Congress meant that DHS could discipline or discharge employees without effective recourse.  Second, rather than afford a right of appeal that is impartial or disinterested, the Regulations put the thumbs of the Agencies down hard on the scales of justice in their favor.  Under current law, MSPB reviews the reasonableness of agency adverse actions and will mitigate a penalty only when it is clearly excessive, disproportionate to the sustained charges, or arbitrary, capricious, or unreasonable.  This is, in fact, a generous standard in an agency's favor.  Under the Regulations at DHS, however, MSPB would have to find that the penalty was "so disproportionate" as to be "wholly without justification." 70 Fed. Reg. at 5281.  This would render an MSPB review almost a nullity and, since it is the MSPB decision that goes to the Federal Circuit and not the employing agency decision, *see* 5 U.S.C. § 1204(a), *Douglas*, 5 M.S.P.R. at 284, it could effectively insulate DHS adverse actions from review. Such a procedure fails to measure up to the sense of Congress that "employees of the Department are entitled to fair treatment in any appeals," 5 U.S.C. § 9701(f)(1)(A), or Congress's express requirement that any modified procedures "further the fair . . . resolution of matters involving the employees of the Department." *Id.* § 9701(f)(2)(C).  The Court concludes that the Agencies failed to apply the plain meaning of the statute in this regard and so are not entitled to *Chevron* deference.

G.   Count 4: MSPB Procedures

In Count 4, the Unions allege that the Agencies exceeded their statutory authority under the HSA by modifying the MSPB's procedural regulations and by assigning MSPB intermediate appellate functions on review of decisions of the Mandatory Removal Panel. Specifically, the Unions challenge 5 C.F.R. § 9701.707(c), which allows for MSPB review of the record of a Mandatory Removal Panel decision; § 9701.706(k)(1), which shortens the time for appeal

to the MSPB; § 9701.706(k)(3), which limits discovery in MSPB appeals; and § 9701.706(k)(5), which authorizes a summary judgment procedure when there are no facts in dispute.

The duties and authorities of the MSPB are detailed in Chapter 12 of Title 5.  The three members of the MSPB are appointed by the President with the advice and consent of the Senate. 5 U.S.C. § 1201.  The MSPB is directed to "hear, adjudicate, or provide for the hearing or adjudication, of all matters within the jurisdiction of the Board under this title."  *Id.* § 1204(a)(1). "The Board shall have the authority to prescribe such regulations as may be necessary for the performance of its functions."  *Id*. § 1204(h).  In addition, Chapter 77 explicitly gives rulemaking authority to MSPB with respect to employee appeals of agency adverse actions.  *See* 5 U.S.C. § 7701(a) ("Appeals shall be processed in accordance with regulations prescribed by the Board."); 5 U.S.C. § 7701(k) ("The Board may prescribe regulations to carry out the purpose of this section.") When MSPB issued such regulations, it cited its authority as found in both 5 U.S.C. §§ 1204 and 7701.  *Hasler v. Dep't of the Air Force*, 79 M.S.P.R. 415, 419 (1988).  The MSPB regulations (1) state that every appellant has a right to a hearing, 5 C.F.R. § 1201.24(d); (2) allow for discovery, and, of course, (3) do not mention the DHS Mandatory Review Panel.

Chapter 77 of Title 5 is remarkably short.  Section 7701 provides that employees and applicants for employment have the right to appeal "any action which is appealable to the [MSPB]" and that the MSPB "may hear any case appealed to it."  5 U.S.C. § 7701(a), (b).  Although that section continues at length, it does not address the particulars of time to appeal or discovery processes.  It does specify that "[a]n appellant shall have the right (1) to a hearing for which a transcript will be kept."  *Id.* § 7701(a).  The next section of Chapter 77 addresses actions involving discrimination and is not directly at issue in this case.  *See id.* § 7702.  The last section in Chapter

77 assures judicial review of MSPB decisions.  *See id.* § 7703.  Congress clearly authorized the Agencies to waive or modify these provisions.  Thus, there can be no doubt that the Agencies acted within their authority when they adopted Regulations that provide for a summary judgment procedure in cases in which there are no contested facts and thereby modified 5 U.S.C. § 7701(a). *See id.* § 9701.706(k)(5).

The Agencies assert further that "each of the challenged rules [was] promulgated under the express authority in the HSA to modify matters 'within the purview of Chapter 77' in creating the new DHS HR management system." Defs.' Mem. at 64 (quoting 5 U.S.C. § 9701(f)(2)). This argument raises a delicate question: did Congress authorize the Agencies to modify the internal regulations of MSPB, an independent agency?  Strange as it may sound, the Court concludes that the Agencies' interpretation of the HSA to that effect is entitled to *Chevron* deference.  Congress anticipated that the Agencies would prescribe regulations for employee appeals procedures, after consultation with MSPB.  5 U.S.C. § 9701(f)(1)(B).  To that end, Congress allowed the Agencies to adopt regulations "which relate to any matters within the purview of chapter 77" and to "modify procedures *under* chapter 77."  *Id.* § 9701(f)(2)(C).[23]  The procedures *under* Chapter 77 are the MSPB regulations which inform litigants of that agency's rules of procedure.  As procedures *under* Chapter 77 and relating to matters within the purview of Chapter 77, the MSPB regulations are subject to modification for cases involving DHS employees.  Because this interpretation of section 9701 is reasonable and consistent with the statutory purpose, even if surprising, it is entitled to deference under step two of *Chevron*.

---

[23]  There is no dispute that the new appellate procedures would "further the fair, efficient, and expeditious resolution of matters," as required by 5 C.F.R. § 9701(f)(2)(C).

The final matter raised by the Complaint is whether the Agencies have improperly assigned an appellate role to MSPB by regulating that it shall review decisions of the Mandatory Review Panel.  Under the Regulations, an employee who is discharged for a Mandatory Removal Offense would receive advance notice, an opportunity to respond, and a written decision from DHS. 5 C.F.R. § 9701.607(b).  That decision would be subject to review by the Mandatory Review Panel, which would conduct a hearing and issue a written decision binding on DHS.  5 C.F.R. § 9701.707(b).  The Regulations would allow appeals from Panel decisions to MSPB, whose decision would be based on the record without a second hearing, 5 C.F.R. § 9701.707(c), and would be appealable to the Federal Circuit under 5 U.S.C. § 7703.  *See id*. § 9701.707(e).  In a typical removal appeal, 5 U.S.C. § 7701 requires that the agency "establish its case to the [MSPB] by a 'preponderance of the evidence.'" *See Jackson v. Veterans Admin.*, 768 F.2d 1325, 1329 (Fed. Cir. 1985) (quoting 5 U.S.C. 7701(c)).  "Under this standard, the appeal requires a *de novo* determination of the facts" by the MSPB.  *Id.*; *see also Brook v. Corrado*, 999 F.2d 523, 528 (Fed. Cir. 1993) ("The MSPB reviews *de novo* the merits of an agency's decision to take adverse action against an employee.").  The Regulations modify Chapter 77 to substitute an "arbitrary and capricious" standard of review for appeals of mandatory removal actions.  *See* 5 C.F.R. § 9701.707(c)(1)(i).

The Plaintiff Unions argue that review by MSPB of the decisions of a DHS Mandatory Removal Panel would be a role contrary to 5 U.S.C. § 1204 and beyond the authority of the Agencies to confer on MSPB.  That section of Title 5 explains the powers and functions of the MSPB and states that it shall:

> hear, adjudicate, or provide for the hearing or adjudication, of all matters within the jurisdiction of the Board under this title, chapter 43 of title 38, or any other law, rule, or regulations, and, subject to otherwise applicable

provisions of law, take final action on any such matter.

5 U.S.C. § 1204(a)(1).[24]  Chapter 77 of Title 5, quoted above, allows employees affected by an

adverse action to appeal to MSPB.  The HSA allows the Agencies to waive and/or modify the

provisions of Chapter 77 and modify procedures under it.  Through the explicit authority to establish

a new HR System for DHS, the Agencies would establish Mandatory Removal Offenses (not in

dispute), a Mandatory Removal Panel (not in dispute), and appeals to MSPB as part of "any other

law, rule, or regulations" over which MSPB has jurisdiction.  5 U.S.C. § 1204(a)(1).  It is certainly

extraordinary for Congress to give Executive agencies the authority to modify or adjust the

jurisdiction of an independent agency and the question is not entirely clear.  However, the Agencies

are due *Chevron* deference in their interpretation of the HSA and the Court finds a straight line from

the broad authority granted by the HSA to the Regulations concerning the appeals at issue.

For these reasons, the Agencies' motion to dismiss Count 4 will be granted and the

Plaintiffs' motion for summary judgment as to Count 4 will be denied.

## IV.    CONCLUSION

For the reasons stated above, the Agencies' motion to dismiss is granted in part and

denied in part and the Plaintiffs' motion for summary judgment is granted in part and denied in part.

The Court concludes that Subpart E and 5 C.F.R. § 9701.706(k)(6) of Subpart G must be enjoined.

As currently proposed, those provisions would violate certain specific requirements established by

Congress in the HSA.  They would not "ensure collective bargaining," would fundamentally alter

FLRA jurisdiction beyond the meanings of "modify" or "affect," and would create an appeal process

---

[24]  Notably, this grant of jurisdiction from Congress is broader than the specific limits set
in place for the FLRA.

at MSPB that is not "fair."  The first two of these are critical components to the entirety of Subpart

E and the Court is unable to determine whether other parts of Subpart E could and should operate

without regard to these infirmities.  Should the Agencies wish to submit an order that more

selectively enjoins Subpart E in a manner otherwise comporting with this memorandum opinion, the

Court would be willing to entertain it.  A memorializing order accompanies this memorandum

opinion.


DATED:  August 12, 2005                          _____/s/_____
                                                 ROSEMARY M. COLLYER
                                                 United States District Judge